MEMORANDUM OPINION

No. 0 4-05-00567-CV

IN THE MATTER OF THE ESTATE OF Willard WALLACE

From the County Court, Uvalde County, Texas

Trial Court No. 5964-01

Honorable Polly Jackson Spencer , Judge Presiding (1)




Opinion by: Karen Angelini , Justice



Sitting: Catherine Stone , Justice

 Karen Angelini , Justice

 Rebecca Simmons , Justice



Delivered and Filed: December 13, 2006



AFFIRMED



 This is a suit for unjust enrichment and for imposition of a constructive trust upon property claimed to be the subject of an
oral agreement to make a will. William Riddick asserts that the trial court erred in granting summary judgment dismissing
his causes of action. We disagree.

 

Factual And Procedural Background


 Riddick and the decedent, Willard Wallace, were distant cousins. (2) Wallace owned approximately 500 acres of land in
Uvalde County, a large portion of which comprises a park otherwise known as Chalk Park Bluff. Beginning around 1973,
Riddick began visiting the park with regularity, during which time, he claims, "a close personal relationship developed
between [him] and Wallace." According to Riddick, Wallace had no children of his own and viewed him as the son he
never had. Riddick claims that in 1977, Wallace spoke to him of future plans to sell the property, whereupon Riddick
expressed an interest in buying the property himself. Riddick states that Wallace agreed to sell the entire 500 acre tract to
him at a later unspecified date and that the underlying consideration for this promise to sell was Riddick's performance of
personal services. (3) Additionally, Riddick claims to have purchased, at Wallace's request, 160 acres of land across the river
from the park "to protect and preserve the Park's beauty and sanctity." (4) 

 In 1991, Wallace contracted to sell 400 of the approximately 500 acres in the park to Claude E. Arnold, an unrelated third
party. Riddick, who is a lawyer, admits that he assisted Wallace in "properly document[ing] the sale"; but, after Arnold
defaulted, Riddick contends he threatened Wallace with legal action if he did not live up to his promise to sell him the
property. Riddick claims that in exchange for his promise not to sue, Wallace and his wife, Sibyl, agreed to bequeath
Riddick an undivided one-half interest in 100 acres, rather than selling him the entire 500 acres as previously promised. (5) 
Indeed, in 1993, Wallace and his wife provided Riddick with a copy of their newly executed mutual wills wherein they
devised to Riddick an undivided one-half interest in 100 acres.

 Wallace died on October 12, 2001, and on December 3, 2001, his widow, Sibyl, filed an Application to Probate the Last
Will and Testament of Willard Wallace and for Letters Testamentary. The will offered for probate, however, was not the
1993 will that left Riddick an undivided one-half interest in the 100 acres, but rather, a 1996 will that completely excluded
Riddick from receiving any interest in the estate. (6) In response, Riddick filed an Opposition to Probate of Will and to
Issuance of Letters Testamentary, claiming undue influence. On February 14, 2002, the trial court admitted the 1996 will to
probate and authorized the letters testamentary. Riddick did not appeal this order but instead brought this suit. During a
three year period, the following petitions and dispositive motions were filed and heard:

June 24, 2002 Plaintiff's Original Petition, which alleged breach of contract and sought the imposition of a constructive
trust upon the property allegedly promised to Riddick;



January 27, 2004 Defendant's Motion for Summary Judgment, which argued that Riddick's claims were barred as a
matter of law and public policy pursuant to § 59A of the Probate Code;



May 6, 2004 Plaintiff's First Amended Petition, which continued to assert breach of contract, but added a claim of
promissory estoppel, and alternatively, breach of fiduciary duties; 



July 7, 2004 Plaintiff's Second Amended Petition, which discarded his cause of action for breach of contract and
instead, plead fiduciary relationship or alternatively, a relationship of special trust and confidence, unjust enrichment,
and constructive trust;



September 17, 2004 Defendants' Amended Motion for Summary Judgment, which argued that there was no legal
contract to make a will and no fiduciary relationship;



April 26, 2005 Trial court's order, granting partial summary judgment, dismissing all of Plaintiff's causes of action with
the exception of unjust enrichment, which the court found the defendant had not addressed in its amended motion;



May 6, 2005 Defendants' Motion for Final Summary Judgment, which addressed the issue of unjust enrichment;



June 17, 2005 Plaintiff's Third Amended Petition, which alleged unjust enrichment and constructive trust; and, 



July 13, 2005 Trial court's order which granted Defendants' Motion for Final Summary Judgment.



 Riddick now brings this appeal, raising the following issues: the trial court erred in granting the Final Summary Judgment
and dismissing Riddick's claim for unjust enrichment without affording him an opportunity to replead; and, the trial court
erred in granting summary judgment because there was an issue of material fact regarding whether a fiduciary relationship
existed between Riddick and Wallace "sufficient to support the imposition of a constructive trust." 

Standard of Review


 To obtain a traditional summary judgment, a party moving for summary judgment must show that no genuine issue of
material fact exists and that the party is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a (c); Randall's Food
Mkts., Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex. 1995); Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548 (Tex. 1985). 
In reviewing the grant of a summary judgment, we must indulge every reasonable inference and resolve any doubts in favor
of the respondent. Johnson, 891 S.W.2d at 644; Nixon, 690 S.W.2d at 549. In addition, we must assume all evidence
favorable to the respondent is true. Johnson, 891 S.W.2d at 644; Nixon, 690 S.W.2d at 548-49. A defendant is entitled to
summary judgment if the evidence disproves as a matter of law at least one element of the plaintiff's cause of action. Lear
Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex. 1991). Once the movant has established a right to summary judgment, the
burden shifts to the respondent to present evidence that would raise a genuine issue of material fact. City of Houston v.
Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979). When the order granting summary judgment does not specify
the grounds upon which the trial court relied, we must affirm the judgment if any of the theories raised in the motion for
summary judgment are meritorious. See State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374, 380 (Tex. 1993).

 Under Rule 166a (i), a party may move for a no-evidence summary judgment on the ground that there is no evidence of one
or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. Tex. R.
Civ. P. 166a (i). We review a no-evidence summary judgment de novo by construing the record in the light most favorable
to the respondent and disregarding all contrary evidence and inferences. Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d
706, 711 (Tex. 1997); Reynosa v. Huff, 21 S.W.3d 510, 512 (Tex. App.--San Antonio 2000, no pet.); Moore v. K Mart
Corp., 981 S.W.2d 266, 269 (Tex. App.--San Antonio 1998, pet. denied). A no-evidence summary judgment is improperly
granted when the respondent brings forth more than a scintilla of probative evidence that raises a genuine issue of material
fact on the challenged elements. Tex. R. Civ. P. 166a (i); Gomez v. Tri City Cmty. Hosp., Ltd., 4 S.W.3d 281, 283 (Tex.
App.--San Antonio 1999, no pet.). Less than a scintilla of evidence exists when the evidence is "so weak as to do no more
than create a mere surmise or suspicion" of a fact, and the legal effect is that there is no evidence. Kindred v. Con/Chem,
Inc., 650 S.W.2d 61, 63 (Tex. 1983). 

Unjust Enrichment

 

 Unjust enrichment occurs when a person obtains a "benefit from another by fraud, duress, or the taking of an undue
advantage." Villarreal v. Grant Geophysical, Inc., 136 S.W.3d 265, 270 (Tex. App.--San Antonio 2004, pet. denied)
(quoting Heldenfels Bros., Inc. v. City of Corpus Christi, 832 S.W.2d 39, 41 (Tex. 1992)). It is an equitable rule providing
a remedy for one who has conferred benefits upon another who has received those benefits unjustly. Id. Unjust enrichment
occurs when "the person sought to be charged [has] wrongfully secured a benefit or [has] passively received one which it
would [be] unconscionable to retain." City of Corpus v. S.S. Smith & Sons Masonry, Inc., 736 S.W.2d 247, 250 (Tex.
App.--Corpus Christi 1987, writ denied). Because the doctrine of unjust enrichment is premised on restitution, the
underlying purpose is to place "an aggrieved plaintiff in the position he occupied prior to his dealings with the defendant."
Burlington N. R.R. v. Southwestern Elec. Power Co., 925 S.W.2d 92, 97 (Tex. App.--Texarkana 1996), aff'd, 966 S.W.2d
467 (Tex. 1998). Further, restitution has been defined as the "[r]eturn or restoration of some specific thing to its rightful
owner or status." Black's Law Dictionary 1339 (8th ed. 2004). It is "[a] body of substantive law in which liability is based
not on tort or contract but on the defendant's unjust enrichment." Id. 

 "Unjust enrichment is not a proper remedy merely because it 'might appear expedient or generally fair that some
recompense be afforded for an unfortunate loss' to the claimant, or because the benefits to the person sought to be charged
amount to a windfall." Heldenfels, 832 S.W.2d at 42 (quoting Austin v. Duval, 735 S.W.2d 647, 649 (Tex. App.--Austin
1987, writ denied)). Riddick initially brought suit claiming that Wallace breached an oral agreement to devise him an
undivided one-half interest in 100 acres. However, section 59A (a) and (b) of the Texas Probate Code, which was enacted in
1979, provides that:

 (a) A contract to make a will or devise, or not to revoke a will or devise, if executed or entered into on or after
September 1, 1979, can be established only by provisions of a will stating that a contract does exist and stating the material
provisions of the contract.



 (b) The execution of a joint will or reciprocal wills does not by itself suffice as evidence of the existence of a contract.



Tex. Prob. Code Ann. § 59A (Vernon Supp. 2006). (7) Prior to the enactment of § 59A, contractual wills were considered
"litigation breeders" and this statute was passed in an attempt to eradicate some of the litigation resulting from both
contractual wills and contracts concerning succession. Ozgur K. Bayazitoglu, Applying Realist Statutory Interpretation To
Texas Probate Code § 59A--Contracts Concerning Succession, 33 Hous. L. Rev. 1175, 1185-86 (1996) (discussing the
history and development of 59A). (8)

 On appeal, Riddick concedes that although § 59A of the probate code bars him from maintaining a breach of contract claim
he is, nevertheless, entitled to enforce the oral agreement between himself and the decedent and recover either the deed to
the undivided one-half interest in the 100 acre tract, or its equivalent value, based solely on equity. Riddick argues that the
trial court erred in granting the Motion for Final Summary Judgment wherein the estate contended that Riddick's claim for
unjust enrichment was barred as a matter of law because § 59A bars the enforcement of the oral agreement to make a will
and, therefore, Riddick was not entitled to the relief requested. (9)

 

 Riddick cites to several cases in support of his position that "an action for unjust enrichment is proper where there is no
contract or when a contract is unenforceable or void for other reasons." See, e.g., Conoco, Inc. v. Fortune Prods. Co., 35
S.W.3d 23, 28 (Tex. App.--Houston [1st Dist.] 1998), aff'd and rev'd in part on other grounds, 52 S.W.3d 671 (Tex. 2000)
(involving action by natural gas sellers to recover for fraud in the inducement and unjust enrichment in sale of field liquids);
R. Conrad Moore & Assoc. v. Lerma, 946 S.W.2d 90, 97 (Tex. App.--El Paso 1997, writ denied) (involving a suit for return
of earnest money after purchaser was unable to obtain financing);Burlington, 925 S.W.2d at 97 (involving suit against a
railroad for alleged overcharges under coal transportation contracts); City of Harker Heights v. Sun Meadows Land, Ltd.,
830 S.W.2d 313, 319 (Tex. App.--Austin 1992, no writ) (involving an alleged breach of contract by city). However, while
unjust enrichment may be an appropriate remedy when a contract is invalid or otherwise enforceable, unjust enrichment
does not provide for enforcement of the contract but rather, for restitution of benefits unjustly conferred. Villarreal, 136
S.W.3d at 270 (holding that unjust enrichment provides that one who receives benefits unjustly should make restitution for
those benefits). 

 Unjust enrichment is an equitable remedy that places an aggrieved plaintiff in the position he occupied prior to his dealings
with the defendant. Burlington, 925 S.W.2d at 97. This remedy is distinct from expectancy damages that allow a plaintiff
to receive the benefit of the bargain by placing him in as good a position as he would have been had the contract been
performed. Hart v. Moore, 952 S.W.2d 90, 97 (Tex. App.--Amarillo 1997, writ denied). Here, Riddick claims he
performed various services that benefitted Wallace. He does not, however, seek to be placed in the position he occupied
prior to his dealings with Wallace by recovering the value of the services performed. (10) Instead, he has consistently
maintained that he should receive the property promised to him because "an agreement implied in law under principles of
equity arose compelling delivery of the contested tract to Plaintiff." To hold otherwise, Riddick argues, would result in
Wallace's estate being unjustly enriched by having received benefits for which compensation was promised to Plaintiff but
not delivered. However, equitable relief is not available merely because it might appear expedient or generally fair that
some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be
charged amount to a windfall. Burlington, 925 S.W.2d at 97 (citing Heldenfels, 832 S.W.2d at 42). 

 Riddick, as a matter of law, cannot recover expectancy damages which are only available pursuant to a contract. (11) See id. 
Accordingly, we overrule Riddick's first issue.

 In his second issue, Riddick argues that rather than granting summary judgment on Riddick's claim for unjust enrichment,
the trial court should have afforded Riddick the opportunity to replead.

While the general rule is that summary judgments should not be used to attack a deficiency in the opposing party's pleading,
In re B.I.V., 870 S.W.2d 12, 13 (Tex. 1994), summary judgment may be appropriate when the pleading deficiency cannot be
cured. Friesenhahn v. Ryan, 960 S.W.2d 656, 658 (Tex. 1998). Thus, if the pleadings show that the plaintiff has no viable
cause of action, summary judgment is proper. See id. 

 The record reflects that, before the trial court's July 13, 2005 final order granting summary judgment, Riddick filed four
petitions, with Plaintiff's Third Amended Petition and Plaintiff's Response to the Motion for Final Summary Judgment
being filed on June 17, 2005. In each of his pleadings, Riddick sought an interest in the property, or the value thereof, that
formed the basis of the alleged oral agreement between the deceased and Riddick based on unjust enrichment. Given our
prior conclusion that Riddick was not entitled to the equitable relief requested, and that this is the exclusive relief he has
ever sought or continues to seek, summary judgment was proper in this instance. Id. Riddick's second issue is overruled.

 In his final issue, Riddick claims there was an issue of material fact with respect to the existence and breach of "an
informal fiduciary/confidential relationship" between him and the decedent. Specifically, Riddick argues that "based on the
close personal relationship" and the promises allegedly made to Riddick by Wallace, there existed a fiduciary relationship,
or alternatively, a relationship of special trust and confidence that compelled each to act in "a manner exhibiting the highest
degree of loyalty and fair dealing." We disagree.

Fiduciary Relationship


 In Meyer v. Cathey, 167 S.W.3d 327, 331 (Tex. 2005) (quoting Associated Indem. Corp. v. CAT Contracting, Inc., 964
S.W.2d 276, 287 (Tex. 1998)), the court stated that "an informal fiduciary duty . . . arises from 'a moral, social, domestic or
purely personal relationship of trust and confidence.'" However, the court in Cathey went on to caution that informal
fiduciary relationships are not created lightly. Id. Further, the court emphasized that "[i]t is well settled that 'not every
relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship.'" Id.
(quotingSchlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 176-77 (Tex. 1997)). A fiduciary duty may arise as a
result of dominance on the part of one or weakness on the part of another. See id.; Associated Indem. Corp., 964 S.W.2d at
287. The determination of whether a fiduciary duty exists or has been breached is a question of law where the underlying
facts are not in dispute. See Cathey, 167 S.W.3d at 331 (holding that there was insufficient evidence of a fiduciary
relationship despite Cathey's assertions that he trusted Meyer in a business matter and had a close personal friendship with
him). Before an informal fiduciary duty in a business transaction will be imposed, it must be established that the special
relationship of trust and confidence existed prior to, and separate from, the agreement made the basis of the suit. Id. 
Further, subjective trust alone will not create a fiduciary relationship; instead the nature of the relationship must be
established from objective facts. See id.; Trostle v. Trostle, 77 S.W.3d 908, 914 (Tex. App.--Amarillo 2002, no pet.).

 The estate asserted in its amended motion for summary judgment that there was no evidence of a fiduciary relationship
between the decedent and Riddick and further, that there was no fiduciary obligation between the parties as a matter of law. 
Riddick responded to the estate's motion by arguing that his deposition testimony and affidavit, along with the affidavit of
Jess Mayfield, created a question of material fact regarding the existence of a fiduciary relationship between Riddick and
the deceased. (12)

 We review a no-evidence summary judgment de novo by construing the record in the light most favorable to the
respondent. Havner, 953 S.W.2d at 711; Reynosa, 21 S.W.3d at 512. In doing so, the record reflects that Riddick and the
deceased were distant relatives; that Riddick performed various personal and legal services for Wallace pertaining to the
property in question, including providing legal advice and representation, as well as maintaining and improving the
property; that Riddick stated Wallace promised to sell him the entire tract but instead, in the early 1990's, Wallace sold 400
acres to Arnold; that Riddick, despite learning of this betrayal continued to provide personal and legal services to Wallace,
including documenting the conveyance, as well as the reconveyance, of the property following Arnold's default; that
according to Riddick, after reacquiring the property and upon being threatened with suit, Wallace agreed to give Riddick an
undivided one-half interest in 100 acres which Wallace subsequently bequeathed to Riddick in a will made jointly with his
wife, Sibyl in 1993; that in the summer of 1995, Willard promised to give Riddick his half of the park and sell him Sibyl's
half for $400,000; that in 1996, Wallace instead sold the 400 acres to Fred Wallace, a relative; that Riddick learned of this
sale from his wife and became very upset, resulting in his visits to Wallace diminishing greatly; and, that without notice to
Riddick, Willard and Sibyl Wallace revoked their 1993 wills and executed new wills in 1996, omitting any mention of
Riddick as a beneficiary.

 Riddick asserts that these facts somehow reflect "a moral, social, domestic or purely personal relationship of trust and
confidence" and are sufficient to raise a genuine issue of material fact regarding the existence of a fiduciary duty owed by
Wallace to Riddick. However, notwithstanding Riddick's assertions that he and the deceased "had a close personal
relationship," "'the fact that the relationship has been a cordial one, of long duration, [is not] evidence of a confidential
relationship.'" Cathey, 167 S.W.3d at 331 (quoting Crim Truck & Tractor Co. v. Navistar Intern. Transp. Corp., 823
S.W.2d 591, 595 (Tex. 1992). Riddick also points to the 1993 will as evidence that he trusted Willard and Sibyl Wallace
and relied on their representation that they would devise an undivided one-half interest in the 100 acres to him; however,
this too is insufficient to create a fiduciary relationship. See id. at 330 (explaining that not every relationship involving trust
and confidence rises to the level of a fiduciary relationship). Moreover, it is well settled that before an informal fiduciary
duty in a business transaction will be found to have existed, it must be shown that the special relationship of trust and
confidence existed prior to, and apart from, the agreement made the basis of the suit. Id.; Associated Indem. Corp., 964
S.W.2d at 287. Here, although Riddick claims he relied on Wallace's assurance that he would sell or devise the property to
him, Riddick did not present any evidence of a special relationship of trust and confidence which existed prior to, and apart
from, the agreement made the basis of this suit. See Havner, 953 S.W.2d at 711; Associated Indem. Corp., 964 S.W.2d at
287. Instead, Riddick presents his subjective belief, unsupported by objective facts, that he trusted Wallace to act in "a
manner exhibiting the highest degree of loyalty and fair dealing." See Trostle, 77 S.W.3d at 914. In sum, the evidence
presented by Riddick to support his claim of an informal fiduciary/confidential relationship is "so weak as to do no more
than create a mere surmise or suspicion" and amounts to less than a scintilla of evidence. Kindred, 650 S.W.2d at 63. 

 The estate further argues that there was no fiduciary duty owed by Wallace to Riddick as a matter of law given Riddick's
admission that he both represented and provided legal advice to Wallace throughout the years regarding the property in
question. (13)

 Riddick denies that his role in providing legal advice to Wallace "on an irregular and infrequent basis over the course of a
decades-long relationship" resulted in an attorney-client relationship between him and Wallace; nevertheless, Riddick
testified as follows:

 Q. (By Mr. Drought) All right. Okay. Let's go back to the legal work that you were doing for Mr. Wallace. What - other
than the two things that you've mentioned, what other legal work did you do for him that you can recall?



 A. [by Riddick] Well, I was on 24-hour call if he had any kind of problem, because I had a law background ...



Thus Riddick's admission that he was on call to provide legal advice and services to Wallace on a 24-hour basis, in addition
to the legal services admittedly performed and set forth in footnote 13 of this opinion, clearly indicates an attorney client
relationship, thereby obviating any finding that Wallace owed a fiduciary duty to Riddick. Cathey, 167 S.W.3d at 330
(holding that an attorney-client relationship establishes a fiduciary duty, as a matter of law, from the attorney to the client). 
Riddick's third issue is overruled. 

Conclusion 


 Accordingly, we affirm the trial court's order granting summary judgment in favor of the estate.



 Karen Angelini , Justice





1. Sitting by special assignment pursuant to Tex. Gov't Code Ann. § 25.00222 (Vernon 2004).

2. Riddick's great grandfather was Wallace's grandfather.

3. Riddick claims he performed a myriad of services for Wallace, including: rewiring the park's outside lights; developing
an inner tube concession; hiring labor for building projects; cleaning and maintaining septic tanks; fencing the property;
irrigation; hay baling, farming and cattle working; grading of roads; building a beam to protect the waterfront; and,
repairing, maintaining, and purchasing farm equipment. 

4. It is unclear from the record when this transaction took place.

5. Wallace planned to sell 400 acres and to continue living on the remaining 100 acres. According to the 1993 will, upon
Wallace's death, Riddick would receive an undivided one-half share in the 100 acres.

6. The 1996 will stated that the Wallaces had recently entered into an earnest money contract to sell 400 acres to Fred
Wallace and his wife, while the remaining 100 acres, containing Willard and Sibyl's homestead, were to be left to the
surviving spouse. 

7. Although later amended, this is the statute in effect at the time suit was filed.

8. Given the scant number of cases filed after 1979 involving the enforcement, either in equity or at law, of an oral
agreement to make a will, it would appear that the legislature was successful in this endeavor. See, e.g., Hearn v. Hearn,
101 S.W.3d 657, 660 (Tex. App.--Houston [1st Dist.] 2003, pet. denied) (legislative intent of § 59A clearly establishes that
extrinsic evidence cannot be considered in determining whether a contractual will exists); Stephens v. Stephens, 877 S.W.2d
801, 804 (Tex. App.--Waco 1994, writ denied)(making a contractual will pursuant to § 59 does not remove right of party to
revoke it); Taylor v. Johnson, 677 S.W.2d 680, 682 (Tex. App.--Eastland 1984, writ ref'd n.r.e.) (holding that the oral
agreement was not probative evidence of a contract to make a will pursuant to § 59A). 

 

9. Riddick contends in his first issue that the trial court erred in granting both the amended summary judgment and the final
summary judgment. However, the amended summary judgment addressed the issues of a contractual claim, which Riddick
concedes he is barred from making, and the claim for breach of a fiduciary relationship, which we address last in this
opinion. The final summary judgment addressed the remaining issue of unjust enrichment, which Riddick presents as his
second issue and which we have addressed in this opinion as Riddick's first issue.

10. Riddick admits he can not provide any receipts or other documentation reflecting the value of the services performed
and further, has never attempted to place a value on these services. Moreover, counsel for Riddick stated at the hearing on
the motion for final summary judgment that Riddick had no intention of seeking restitution for the value of labor performed
or materials furnished. 

11. Riddick further sought to recover title to the property under a constructive trust theory; however, this equitable remedy
is also unavailable to Riddick given our conclusion, addressed subsequently in this opinion, that there was no evidence of a
confidential/fiduciary relationship between the parties. See Stout v. Clayton, 674 S.W.2d 821, 823 (Tex. App.--San Antonio
1984, writ ref'd n.r.e.). 

12. The estate's objections to the affidavits of Riddick and Mayfield were sustained, whereupon the trial court granted
partial summary judgment, thereby dismissing the claim for breach of fiduciary duty. On appeal, Riddick does not
complain that the trial court erred in granting these objections. See Cmty. Initiatives, Inc. v. Chase Bank, 153 S.W.3d 270,
281 (Tex. App.--El Paso 2004, no pet.) . 

13. Although Riddick claims he did not actively practice law during the times relevant to the events in this lawsuit, he states
in his brief that over the years he assisted Wallace by:



 a. "mediating the resolution of a gun-toting fence dispute between Wallace and his neighbor Elmo Jones over Jones's cattle
crossing Wallace['s] property to water at the river";



 b. "facilitating the redrafting of the Contract for Deed between Wallace and Arnold";



 c. "easing the eventual repossession of the Park after Arnold defaulted";



 d. "appearing at administrative hearings in front of the Nueces River Water Authority to establish Wallace's water rights";



 e. "aiding, at Wallace's direction and insistence, the reacquisition by Wallace and Defendant Sibyl Wallace of a four-acre
tract of land previously deeded to Sibyl's daughter and son-in-law to preclude the sale of the property to a third party as the
daughter and son-in- lawn [sic] divorced by reimbursing the daughter for their expenditures installing electricity, propane,
and a well on the property";



 f. "advising Wallace whether to pay attorney's fees that he questioned as excessive from litigation over the Park in the early
'70's between Wallace and his brothers and sisters";



 g. "responding to an accident caused by Wallace's cows getting out on the highway and obtaining liability insurance for
Wallace where he previously had none";



 h. "resolving Wallace's concern regarding his potential liability when one of his [sic] workers fell off a ladder"; and



 i. "advising Wallace on structuring his will to accomplish his desired purpose."